UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | 1:12-cr-162-JAW |
| | ) | |
| ALAN GILLOTTI, | ) | |
| | ) | |
| Defendant | ) | |

**RECOMMENDED DECISION ON MOTION TO SUPPRESS**

The United States has indicted Alan Gillotti for knowing possession of an unregistered shotgun with a barrel length of less than 18 inches and an overall length of less than 26 inches in violation of 26 U.S.C. § 5845(a), 5861(d), and 5871. The indictment includes a forfeiture allegation under 26 U.S.C. § 5872 and 28 U.S.C. § 2461(c). On October 31, 2012, Alan Gillotti filed a motion to suppress based on an illegal search and requests the suppression of the shotgun as well as photographic evidence and statements obtained as a result of the discovery of the shotgun. The court referred the motion for report and recommendation. I recommend that the court grant the motion.

**PROPOSED FINDINGS OF FACT**

The government requested an evidentiary hearing in its opposition memorandum and a hearing was held on March 11, 2013. At the hearing the government called the investigating officers, Maine State Troopers Brian Harris and Dennis Quint, to testify. The defendant also took the stand. The documentary evidence admitted consists of the troopers' police reports, multiple photographs taken at the scene, an "evidence seizure / property locker inventory" record that identifies the incident as an accidental shooting, and a copy of the defendant's medical

"transfer / discharge summary" prepared by a care provider at the Houlton Regional Hospital. The evidence establishes the following sequence of events by a preponderance of the evidence.

On April 25, 2012, Alan Gillotti shot himself in the foot with a .410 shotgun while standing on the threshold of a side-entrance to his home. He hobbled into his bedroom and leaned the shotgun against a bookcase just inside the door and within arm's reach of his bed. He called for emergency medical assistance and his call was routed not only to EMTs but also to the state police.

Trooper Dennis Quint arrived at Gillotti's home as the EMTs were loading Gillotti into the ambulance. Quint asked what happened and Gillotti explained that he accidentally shot himself in the foot with his .410 shotgun while preparing to shoot at a critter in his yard that was harassing his cat. Gillotti specifically described the weapon as his ".410" rather than generically as a "shotgun." Quint said he would have to obtain the weapon involved for purposes of his investigation. Gillotti initially expressed resistance to the idea, asking why Quint needed to go in, but he relented when Quint said he needed get the weapon for purposes of his investigation. Gillotti told Quint that the weapon was just inside his bedroom beside the bed and that Quint would have to enter through the side door. Quint went to the door after the ambulance left. He saw blood on the threshold and the distinct sign of a shotgun blast, with many small pellet impressions rather than one bullet hole. Around this time a second trooper arrived on the scene, Sergeant Brian Harris.

Quint explained to Harris what occurred and told Harris that Gillotti had consented to entry to recover the weapon. Both troopers more likely than not stood in the vicinity of the side entry during their discussion and observed and commented on the shotgun blast on the floor. Quint testified at the hearing that he told Harris that Gillotti gave them consent to go in and get

2

"the rifle."[1]  I do not credit this testimony.  Gillotti told Quint that he had shot himself with his ".410" and it would have been evident to both troopers when they discussed the matter that Gillotti had fired a shotgun.  Assuming for the sake of argument that Quint absentmindedly said rifle, Harris would have known he misspoke and would have corrected such a misstatement.  Indeed, Harris testified on cross examination that it was obvious the weapon used was a shotgun.  I have credited Gillotti's testimony that he specifically described the weapon as his ".410" and I find it more likely than not that Quint would have shared this information with Harris before leaving the scene.   I find that Quint effectively communicated to Harris that they had consent to get "the shotgun" and that both officers understood that Gillotti had consented to the seizure of a .410 shotgun that would be just inside the bedroom near the bed.[2]

The troopers decided that Harris would go in and collect the shotgun and that Quint would go to the hospital to question Gillotti further.  In all likelihood the troopers first "cleared" the premises together to ensure nobody was present.  If not, then Quint likely cleared the premises on his own before Harris arrived.  The home is a small, single story structure without a basement and scanning the rooms for occupants would have taken a negligible amount of time and would not have justified flipping over a mattress.

---

[1]  In his report, Trooper Quint wrote that Gillotti told him that "as he was cocking the hammer the rifle, a .410 shotgun, discharged through his foot."  (Trooper Quint's Report at 1, ECF No. 31-1.)  Quint testified that he wrote .410 into his report only to accurately describe the weapon that caused the injury, not to describe what Gillotti said verbatim.  Nevertheless, I find that Quint's use of .410 in the report is further evidence that Gillotti identified the weapon as a .410.  Gillotti also identified the weapon as a .410 when speaking with care providers at the hospital, further indicating that this was how he routinely identified the weapon.  (Transfer/Discharge Summary, Def.'s Ex. 17.)

[2]  In his report, Sergeant Harris wrote that Quint told him there was consent to enter and "secure the weapons" (plural).  (Sgt. Harris's Report, ECF NO. 31-2.)  Quint, on the other hand, wrote that Alan gave him consent "to enter his home" and that he told Harris that there was consent "to enter his residence."  (Trooper Quint's Report at 2.)  According to Quint, Harris responded that he would go in and secure the weapon (singular).  (Id.)  Nothing in this language suggests that Gillotti ever expressed consent to have his house searched, such as by having his mattress turned over.  Nor does the language suggest permission to search the premises for any and all weapons.  Quint sought permission to retrieve the weapon that caused the injury and Gillotti's consent was so limited.

In court, Quint testified that he told Harris there was consent to get "the rifle."  Harris then used this obviously mistaken descriptor to explain why he did not appreciate that he was going in to collect a specific shotgun just inside the bedroom and therefore conducted an exploratory search to find every shotgun that might be in the house.  This "rifle" testimony was unreliable and I do not credit it.

After Quint left, Harris went into the bedroom where there was a .410 shotgun in plain view leaning against the bookcase. Bloody footprints at the scene demonstrated that Gillotti was in the room and that he likely sat on the bed within reach of the shotgun while waiting for the ambulance. Harris also saw a .22 rifle leaning against the other side of the bookcase, parts from a disassembled handgun, and a Remington box and some loose shotgun shells resting on the floor at the foot of the bookcase. Some of the shells were .410 and some were 20 gauge.[3]

Based on the presence of 20 gauge shells, Harris reasoned that there would be a 20 gauge shotgun somewhere on the premises and chose to search it out rather than just taking the .410. He quickly discovered a short-barreled 20 gauge shotgun underneath Gillotti's mattress and this is the weapon that earned Gillotti the indictment. Harris seeks to justify his decision to scavenge about for a 20 gauge shotgun by testifying (and writing in his report) that he regarded the .410 to be unsafe to fire because it had some duct tape on it and showed signed of modification. He also testified that the weapon was long-barreled and would be hard to hold and shoot oneself in the foot with. On these grounds, Harris says he thought the .410 likely was not the weapon Gillotti shot himself with and that this was why he searched for another shotgun. On the other hand, Harris also testified that he thought he was there to secure *all* weapons. I do not find credible Harris's testimony about why he ruled out the .410 as the weapon Gillotti shot himself with.[4] The fact that Harris seeks to explain why he rejected one specific weapon to search for another

---

[3]  The 20 gauge shell appears to be a larger shell than the .410 based on the photographs, but whether Sergeant Harris was capable of deducing that the impression on the floor was consistent with a .410 rather than a 20 gauge, I have no knowledge. There was no testimony on this issue.

[4]  The pictures taken of the weapon suggest that Gillotti used tape to help secure the wooden fore end to the barrel and also used tape around the neck of the stock. (E.g., Def.'s Ex. 16.) The length of the barrel is not that significant and someone could shoot himself in the foot with the weapon. Harris was familiar with Gillotti, according to the government, and would have understood that he is a relatively tall individual. (Gov't Opposition at 2, ECF No. 31.) These facts and the appearance of the weapon lead to the very likely conclusion that someone could indeed shoot himself in the foot with it. It certainly appears unsafe, but not inoperable, as compared to the dismantled handgun found on the premises.

supports the finding that he understood that consent was limited to one specific weapon. Harris's stated rationale for searching and his indication that he thought there was consent to "secure all weapons" were most likely developed after the fact to explain his search.

Meanwhile, Quint had been able to speak with Gillotti at the hospital, which was only ten minutes away. Quint initially questioned Gillotti about the guns he had at his home. Gillotti indicated that he had the .410, a .22 rifle, and a disassembled handgun. Quint testified and reported that he then called Harris to tell Harris about the guns (why was never made clear) and that Harris then told him about his discovery of a 20 gauge shotgun with a sawed off barrel. Quint then asked Gillotti about the 20 gauge and Gillotti acknowledged its existence and said he had forgotten about that one.

## DISCUSSION

Gillotti requests that the court suppress all evidence of the recovery and seizure of the shotgun listed in the indictment, as well as other evidence derived from the search of his residence. Gillotti maintains that the search of his premises was illegal because Sergeant Harris conducted a warrantless search, without probable cause, and beyond the scope of consent. (Motion to Suppress, ECF No. 29.) The government seeks to establish the legality of the search based exclusively on consent. It maintains that it was reasonable to interpret the consent to permit a search because Gillotti allowed the troopers to enter to retrieve a "rifle," Quint told Harris there was consent to get the weapon used in the incident, and Harris was left behind and had to investigate which weapon that might have been. (Gov't Opposition at 2, 5, ECF No. 31.)[5]

---

[5] Gillotti's motion also challenges the voluntariness of his consent because he was in distress and initially withheld consent until Quint insisted that he needed to recover the weapon. This argument was not pressed at the evidentiary hearing and I did not see any basis in the testimony for finding that Gillotti's consent was somehow coerced by Quint or that Gillotti's will was otherwise overborne by the totality of the circumstances. Rather, the evidence demonstrates that Gillotti reluctantly-but-voluntarily consented to the retrieval of the .410 shotgun and indicated that it could be found just inside his bedroom.

**Consent to Search**

"The Fourth Amendment protects the right of the people to be secure against unreasonable searches and seizures by the Government." United States v. Infante, 701 F.3d 386, 392 (1st Cir. 2012). Warrantless searches are "per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967). "[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). Officers do not need a warrant to search when a person with authority to consent freely and voluntarily gives consent. United States v. Jones, 523 F.3d 31, 37 (1st Cir. 2008).

A warrantless search may not exceed the scope of the consent granted. United States Chaney, 647 F.3d 401, 406 (1st Cir. 2011). The scope of consent is generally measured by the expressed object of the search and an objective inquiry into what "the typical reasonable person [would] have understood by the exchange between the officer and subject." Id. (quoting Florida v. Jimeno, 500 U.S. 248, 251.

Based on the proposed factual findings, the typical reasonable person would have understood that Gillotti gave Trooper Quint consent to enter his home, see that nobody else was there, locate the bedroom, and retrieve the .410 shotgun that was just inside the room. Because Sergeant Harris's search of the premises went beyond the scope of Gillotti's consent, it violated the Fourth Amendment and the 20 gauge shotgun must be suppressed. Additionally, the photographs of the 20 gauge shotgun, Gillotti's statement to Quint at the hospital acknowledging his possession of the 20 gauge shotgun, and other derivative evidence (if any) must be

suppressed because they amount to fruit of the poisonous tree, meaning that Harris and Quint obtained them by exploitation of the illegal search.  Wong Sun v. United States, 371 U.S. 471, 487-88 (1963).  The government has not suggested that special factors would justify the admission of derivative evidence and it appears clear that the photographs of the 20 gauge and Gillotti's acknowledgement of the 20 gauge shotgun were contemporaneously obtained through direct exploitation of illegal search.  See United States v. Stark, 499 F.3d 72, 76 (1st Cir. 2007) (discussing factors set forth in the Brown v. Illinois, 422 U.S. 590, 603-604 (1975)).

## CONCLUSION

For reasons set forth above, I recommend that the court adopt the proposed findings of fact and grant Alan Gillotti's motion to suppress (ECF No. 29).

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

March 21, 2013